UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| CANDELARIO HERNANDEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 6:20-CV-00034 |
| | § | |
| AARON KLOESEL, COREY FURR, | § | |
| GENE MILLER, JOHN CIRONE, | § | |
| MANUEL PERALTA, and | § | |
| ESMEREJILDO MORENO, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Texas inmate Candelario Hernandez claims that Defendant Aaron Kloesel, an officer in the Texas prison system, body slammed him into a coma, leaving Hernandez permanently mentally and physically disabled. Hernandez sued Kloesel for using excessive force. He also sued Kloesel's superiors—Corey Furr, Gene Miller, John Cirone, Manuel Peralta, and Esmerejildo Moreno (the "Supervisory Officers")—for not supervising Kloesel appropriately.

The Supervisory Officers now move for summary judgment on Hernandez's claims. They argue that Hernandez cannot meet the high bar of proving supervisory-officer liability because, despite some other disciplinary issues, Kloesel has no history of using excessive force. The Court agrees. Defendants Corey Furr, Esmerejildo Moreno, Manuel Peralta, Gene Miller, and John Cirone's Motion for Summary Judgment, (Dkt. No. 76), is **GRANTED**.

I.  **BACKGROUND**[1]

    A.   THE INCIDENT

Five-and-a-half years ago, inmate Candelario Hernandez ate an early lunch. (Dkt. No. 84-1 at 109). As he left the prison mess around 9:50 a.m., Hernandez asked Officer Larkins if he could go to the infirmary early for his 2:00 p.m. appointment. (*Id.*). Larkins said yes. (*Id.*).

Hernandez reached the prison infirmary at 9:57 a.m. and approached Officer Aaron Kloesel, who was guarding the door. (*Id.*). Hernandez gave Kloesel his appointment slip, but Kloesel told Hernandez that he was early and needed to go back to his unit. (*Id.* at 109, 112). Hernandez refused, insisting that he had permission to be there. (*Id.* at 109); (Dkt. No. 84-2 at 23).

That's when things got heated. As Kloesel tried to close the infirmary door, Hernandez blocked it with his foot. (Dkt. No. 84-1 at 109–12). Kloesel again told Hernandez to leave. (*Id.*). Hernandez refused. (*Id.*). The two started yelling and got in each other's faces. (*Id.*); (Dkt. No. 84-2 at 23). Hernandez, still in the infirmary's threshold, stepped closer to Kloesel. (Dkt. No. 84-2 at 23). They were now chest to chest. (*Id.*).

Kloesel then bent slightly at the knees, wrapped his arms around Hernandez, lifted him into the air, and slammed him headfirst into the ground. (*Id.*); (Dkt. No. 84-1 at 111–

---

   [1]  Except where noted, this Section contains only undisputed facts, and all facts and reasonable inferences have been construed in favor of the nonmovant. *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020). The Court has not weighed evidence or made credibility findings. *Id.*

12). Larkins, drawn to the scene by the shouting, saw Kloesel trying to handcuff the now-unconscious Hernandez. (Dkt. No. 84-2 at 24); (Dkt. No. 84-1 at 109–12). Larkins yelled for Kloesel to stop, which he did. (Dkt. No. 84-2 at 24). That is when Larkins saw the blood trickling out of Hernandez's nose. (*Id.*).

Larkins initiated an emergency response and told central control to call for Emergency Medical Services ("EMS"). (Dkt. No. 84-1 at 109). Several officers arrived, followed shortly by unit medical staff. (*Id.* at 109–10). They put the unresponsive Hernandez on a gurney and pushed him into the infirmary's emergency room. (*Id.* at 110). EMS arrived thirty minutes later and air-lifted Hernandez to the Brooke Army Medical Center, where surgeons relieved the pressure in his skull, intubated him, and placed him in the Intensive Care Unit ("ICU"). (*Id.*). It is unclear how long Hernandez remained comatose. (Dkt. No. 49 at 10–11) (citing Dkt. No. 1 at 16). Hernandez alleges that he now suffers from permanent cognitive disability, memory and vision impairment, paralysis on the left side of his body, and the inability to walk. (Dkt. No. 1 at 9).

As a result of the incident, Kloesel was charged with two rule violations, including one for using excessive force. (Dkt. No. 84-1 at 113). Kloesel was recommended for dismissal, (*id.*), and four days after the altercation, the warden asked Kloesel to leave the Stevenson Unit, (Dkt. No. 84-2 at 5). Kloesel was ultimately permitted to resign in lieu of dismissal. (Dkt. No. 76-1 at 3).

### B. THE SUPERVISORY OFFICERS' ROLES

In the wake of the incident, Hernandez brought claims not only against Kloesel but also against several of his supervisors, alleging that their inaction enabled the use of

excessive force. (Dkt. No. 1 at 11–15). The Supervisory Officers—Manuel Peralta, Gene Miller, John Cirone, Corey Furr, and Esmerejildo Moreno—held various positions over Kloesel at the Connally and Stevenson Units in the Texas Department of Criminal Justice ("TDCJ").

Defendant Manuel Peralta served as the senior warden at the Connally Unit when Kloesel worked there.[2] (Dkt. No. 84-2 at 197–99). As warden, Peralta was the "reprimanding authority" with the power to discipline employees and even remove them from their positions. (*Id.* at 199, 207–09). Peralta also had some role in deciding whether an employee needed additional training after a disciplinary incident. (*See id.* at 200–02).

Defendants Majors Gene Miller and John Cirone were also high-ranking officers in Kloesel's chain of command at the Connally Unit. (*Id.* at 310–11). Miller supervised the administrative-segregation section of the Connally Unit; Cirone, the general-population section. (*Id.* at 311). As majors, Miller and Cirone were responsible for disciplining employees, training guards, and enforcing TDCJ policies. (*Id.* at 232). Their duties included assessing whether guards posed a safety risk to inmates based on their judgment, truthfulness, and commitment to following the rules. (*Id.* at 234–37).

At some point, Kloesel transferred from the Connally Unit to the Stevenson Unit,[3] where Defendant Corey Furr served as the senior warden. (*Id.* at 138). As the highest-

---

[2] Though the exact dates of Kloesel's employment are unclear, the record shows that he was at the Connally Unit from at least January of 2007 through the end of August of 2016. (Dkt. No. 76-1 at 77–78). By August 2019, he had transferred to the Stevenson Unit. (*See* Dkt. No. 84-2 at 223, 290); (Dkt. No. 84-1 at 117).

[3] The record is unclear about when this occurred. (*See* Dkt. No. 84-2 at 223, 290).

4

ranking officer and reprimanding authority at Stevenson, Furr was responsible for knowing whether employees had a history of disciplinary issues. (*Id.* at 42, 139).

Finally, Defendant Esmerejildo Moreno was a captain at the Stevenson Unit during Kloesel's tenure. (*Id.* at 30). Moreno was a disciplinary-hearing officer responsible for investigating employee misconduct and recommending charges for rule violations. (*Id.* at 32–33, 42–43).

### C.  KLOESEL'S HISTORY

Before the altercation with Hernandez, Kloesel had been involved in three other incidents, though none resulted in a finding that Kloesel had used excessive force.

#### 1.  The Hogan Incident

In 2010, Kloesel was involved in an incident with an inmate named Dexter Hogan. (Dkt. No. 84-1 at 7–12). Hogan sued, claiming that Kloesel used excessive force against him while he was handcuffed and shackled. (*Id.* at 10–11). The district court granted summary judgment against Hogan, finding that Hogan's "medical records show[ed] Hogan suffered no actionable injury" as a result of the incident and that, in any event, Kloesel was entitled to qualified immunity. *Hogan v. Kloesel*, No. 5:11-CV-00060, 2012 WL 1910027, at *2–3 (W.D. Tex. May 25, 2012); (*see also* Dkt. No. 84-2 at 319–21). What's more, "Hogan was found guilty in a TDCJ disciplinary proceeding of assaulting Officer Kloesel." *Hogan*, 2012 WL 1910027, at *3; (*see also* Dkt. No. 84-2 at 321). There is no evidence that this incident ended up in Kloesel's disciplinary record. (*See* Dkt. No. 76-1 at 31) (Kloesel's disciplinary record); (Dkt. No. 84 at 6) ("In the year and a half between

5

the [Hogan] incident and the Court's Order, there is no documentation of any investigation of the use of force." (citing Dkt. No. 84-2 at 226)).

### 2. The Back-Gate Incident

Six years later, while at the Connally Unit, Kloesel violated TDCJ policies when he "failed to ensure [that] proper strip searches and vehicle/trailer searches were conducted." (Dkt. No. 84-1 at 15, 21). He also left the inside back gate open for approximately 20 minutes without staying "in the proximity of the gate." (*Id.*). Defendants Cirone and Miller addressed these violations with Kloesel. (*See id.* at 15, 21–22); (*see* Dkt. No. 84-2 at 273–74, 296–97).

After this incident, Cirone attempted to train Kloesel and several other officers on proper back-gate procedures, (Dkt. No. 84-1 at 15), but Kloesel "was not receptive to the corrective action" and "only made excuses," (*Id.*). The next day, Cirone again spoke to Kloesel about his conduct and "his inability to accept responsibility and corrective action." (*Id.*). "Kloesel continued to make excuses and directed the blame toward his supervisors." (*Id.*). For his conduct at the back gate and contumacy during the training that followed, Kloesel "was removed from the field department." (*Id.*). Cirone also recommended formal disciplinary action, (*id.* at 16), in which Miller took part, (*id.* at 21–22); (Dkt. No. 84-2 at 273–74).

Miller concluded from the investigation that Kloesel had lied about being assigned to the back gate. (Dkt. No. 84-1 at 21); (Dkt. No. 84-2 at 301–03). But Kloesel was not charged with a separate violation for lying. (Dkt. No. 84-2 at 306–09). Ultimately, Peralta

6

imposed a six-month disciplinary probation on Kloesel for his conduct during the back-gate incident and the investigation.  (*Id.* at 249); (Dkt. No. 76-1 at 78).

### 3. The Sullivan Incident

Following this incident, Kloesel was transferred to the Stevenson Unit. (Dkt. No. 84-2 at 223). There, just two months before his altercation with Hernandez, Kloesel was involved in a third incident. (Dkt. No. 84-1 at 117–22); (Dkt. No. 76-1 at 41, 47). After three-and-a-half hours of conspicuous drinking—to which Kloesel allegedly turned a blind eye—one inmate beat another inmate, Mike Sullivan, to death on Kloesel's watch. (*See* Dkt. No. 84-1 at 117–22, 127–29); (Dkt. No. 84-2 at 50–53, 88–92, 94–110). Defendants Furr and Moreno investigated the incident and identified the officers whose actions—or inaction—contributed to it. (Dkt. No. 84-2 at 44–46, 170–73). Kloesel was written up and placed on six months of disciplinary probation for not immediately calling 9-1-1 when he found the mortally injured inmate. (Dkt. No. 76-1 at 41); (Dkt. No. 84-1 at 124); (Dkt. No. 84-2 at 174). Hernandez contends, however, that Kloesel committed several other violations for which he was not charged. (Dkt. No. 84 at 10–14, 19).

## II. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the suit's outcome under governing law. *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And "[a] dispute about

a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)). "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)), *as revised* (July 14, 2017). If evidence is merely colorable or not significantly probative, summary judgment is

appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant. *Carr*, 866 F.3d at 601. This means that courts must resolve factual controversies in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

### B.   FAILURE-TO-SUPERVISE CLAIMS

"Under section 1983, 'supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability.'" *Hicks v. LeBlanc*, 81 F.4th 497, 504 (5th Cir. 2023) (quoting *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)). Indeed, "the term 'supervisory liability' is a misnomer" because each government official "is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). A supervisor who is not personally involved in the alleged constitutional deprivation may be held liable only if there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Thompkins*, 828 F.2d at 303–04. The Fifth Circuit evaluates supervisory-officer claims using the same standard as municipal-liability claims. *Rios v. City of Del Rio*, 444 F.3d 417, 426 (5th Cir. 2006) (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc)); *Doe*, 15 F.3d at 453 ("The legal elements of an individual's supervisory liability and a political subdivision's liability . . . are similar enough that the same standards of fault and causation should govern.").

Generally, a supervisor may be liable under Section 1983 on one or both of two theories: (1) the supervisor instituted or ratified a policy or custom "so deficient" that "the policy itself is a repudiation of constitutional rights"; or (2) the supervisor failed to train or supervise his subordinates. *Brown v. Callahan*, 623 F.3d 249, 253–54 (5th Cir. 2010) (quoting *Cozzo v. Tangipahoa Parish Council – President Gov't,* 279 F.3d 273, 289 (5th Cir. 2002)).

> A failure to supervise or train claim arises when the plaintiff shows that (1) the defendant failed to supervise or train the alleged bad actor, (2) there is a causal connection between the infringement of the plaintiff's constitutional rights and the lack of supervision or training, and (3) the failure to supervise or train exhibited deliberate indifference to the plaintiff's constitutional rights.

*Parker v. Blackwell*, 23 F.4th 517, 525 (5th Cir. 2022). "The infringement of the plaintiff's constitutional rights must be an 'obvious' and 'highly predictable' consequence of the failure to train" or supervise. *Id.* (quoting *Culbertson v. Lykos*, 790 F.3d 608, 625 (5th Cir. 2015)).

"Additionally, relief will not typically be available absent a showing of a pattern of constitutional violations, as opposed to a single incident." *Id.* That is because "[d]eliberate indifference is a 'high standard' that requires 'a complete disregard of the risk that a violation of a *particular* constitutional right would follow the decision'" not to adequately train or supervise. *Edwards v. City of Balch Springs*, 70 F.4th 302, 312 (5th Cir. 2023) (emphasis added) (quoting *Liggins v. Duncanville*, 52 F.4th 953, 955 (5th Cir. 2022)). Thus, to "show deliberate indifference, a plaintiff normally must allege a pattern of similar constitutional violations" by the subordinate sufficient to put his supervisors on

notice of the unique risk he poses. *Id.* (quoting *Henderson v. Harris Cnty.*, 51 F.4th 125, 131 (5th Cir. 2022) (per curiam)).

"A pattern requires *similarity and specificity*; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Id.* (emphasis in original) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009)). "While the specificity required should not be exaggerated, [the Fifth Circuit's] cases require that the prior acts be fairly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act have involved injury to a third party." *Est. of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

## III. DISCUSSION

Even taking Hernandez's allegations as true and viewing the evidence in the light most favorable to him, the Court finds that Hernandez has not established a pattern of similar constitutional violations necessary to support his failure-to-supervise claims. Kloesel's disciplinary history, while concerning, lacks the similarity and specificity required to show that the Supervisory Officers were deliberately indifferent to the risk that Kloesel would use excessive force against an inmate. *See Edwards*, 70 F.4th at 312. And in any case, the record shows that the Supervisory Officers were *not* deliberately indifferent to Kloesel's disciplinary infractions; rather, the Supervisory Officers took corrective action throughout Kloesel's employment. Perhaps, as Hernandez argues, the Supervisory Officers could have—or even should have—done more. But that is not the

11

standard. The standard is deliberate indifference, and the Supervisory Officers were not indifferent to Kloesel's conduct.

### A. DISCIPLINARY HISTORY

Hernandez attempts to establish a pattern by pointing to three main incidents in Kloesel's employment history: (1) the Hogan incident in 2010; (2) the back-gate incident in 2016; and (3) the Sullivan incident in 2019. (*See* Dkt. No. 84 at 6–14); (Dkt. No. 1 at 2–7, 11–15); *see supra* Section I(C). But these incidents do not show even a single instance of excessive force by Kloesel, much less the *pattern* of similar violations required to put the Supervisory Officers on notice.

First, the Hogan incident cannot form part of a pattern because a federal district court explicitly rejected Hogan's excessive-force claim against Kloesel. *Hogan*, 2012 WL 1910027, at *2–3. The court granted summary judgment against Hogan, finding that he "suffered no actionable injury," that he had "no basis for an assault claim against Officer Kloesel," and that Kloesel was entitled to qualified immunity. *See id.* Moreover, "Hogan was found guilty in a TDCJ disciplinary proceeding of assaulting Officer Kloesel." *Id.* at *3. There is also no evidence that this incident was documented in Kloesel's disciplinary record, (*see* Dkt. No. 76-1 at 31) (Kloesel's disciplinary record), as Hernandez acknowledges, (Dkt. No. 84 at 6) ("In the year and a half between the [Hogan] incident and the Court's Order, there is no documentation of any investigation of the use of force.").

"To act with deliberate indifference, a state actor must know of and disregard an excessive risk to the victim's health or safety." *Doe v. Ferguson*, 128 F.4th 727, 735 (5th Cir.

12

2025) (quoting *Whitley v. Hanna*, 726 F.3d 631, 641 (5th Cir. 2013)). "The state actor's actual knowledge is critical to the inquiry—a failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, does not rise to the level of deliberate indifference." *Id.* (quoting *Whitley*, 726 F.3d at 641). Because Hogan's excessive-force claim was rejected—and because there is no evidence that the Supervisory Officers knew about the incident—Hernandez cannot show that it contributed to the Supervisory Officers' actual knowledge that Kloesel posed a serious risk of using excessive force.

Second, the back-gate incident at the Connally Unit, while demonstrating poor judgment, involved entirely different types of conduct. Those violations—failing to conduct proper searches and leaving a security gate open—relate to security protocols rather than inmate treatment or use of force. (*See* Dkt. No. 84-1 at 15, 21). The Fifth Circuit has been clear that prior bad acts must "point to the specific violation in question" to establish deliberate indifference. *Edwards*, 70 F.4th at 312. And "in the case of an excessive force claim, as here, the prior act must have involved injury to a third party." *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010). Security-protocol violations, while serious, do not involve injury to a third party or suggest a propensity for using excessive force against inmates. The same goes for Kloesel's apparent contumacious and dishonest conduct during the subsequent investigation. (*See* Dkt. No. 84-1 at 15, 21); (Dkt. No. 84-2 at 301–03).

Third, the Sullivan incident in 2019 also fails to establish—or even contribute to—a pattern of excessive-force violations. That incident involved Kloesel's failure to call 9-

13

1-1 immediately after finding an unconscious inmate—a failure to act, not an affirmative use of excessive force. (Dkt. No. 84-1 at 117–18, 124); (Dkt. No. 76-1 at 41, 47). While the Sullivan incident and the altercation with Hernandez both implicate inmate safety, they involve fundamentally different types of misconduct. A failure to promptly call for medical assistance does not show a propensity for using excessive physical force against inmates. More broadly, failing to stop someone else from using excessive force is not the same thing as using excessive force.

In sum, Kloesel's history shows only one *allegation* that he used excessive force against an inmate—the Hogan incident in 2010. And while it is "not impossible" to prove deliberate indifference using a single incident, "[t]he 'single incident exception' is extremely narrow." *Valle*, 613 F.3d at 549 (quoting *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)). Here, the one claim of excessive force that *could* serve to put the Supervisory Officers on notice was (1) rejected by a federal court, *see Hogan*, 2012 WL 1910027, at *2–3, and (2) not in Kloesel's disciplinary record, (*see* Dkt. No. 76-1 at 31). Indeed, the TDCJ records would have shown that Hogan assaulted Kloesel. *See Hogan*, 2012 WL 1910027, at *3. As a result, Hernandez has not met the high standard required to show a pattern of similar incidents sufficient to make the Supervisory Officers aware of a significant risk that Kloesel would use excessive force against an inmate.

### B.     THE SUPERVISORY OFFICERS' DISCIPLINARY RESPONSE

And even if Hernandez could establish a pattern of similar violations, the record does not support a finding that the Supervisory Officers were indifferent to Kloesel's conduct or the risk he posed. "[L]iability does not attach where the official with authority

to take corrective action responds reasonably to a risk of harm, 'even if the harm ultimately was not averted.'" *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 359 (5th Cir. 2020) (quoting *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000)). In fact, Fifth Circuit precedent "makes it clear that negligent delays, botched investigations of complaints due to the ineptitude of investigators, or responses that most reasonable persons could have improved upon do not equate to deliberate indifference." *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019); (citing cases).

Rather than ignoring Kloesel's misconduct, the record shows that the Supervisory Officers took disciplinary action in response to both of the documented violations. After the back-gate incident at the Connally Unit, Defendants Cirone and Miller attempted to train and discipline Kloesel. (Dkt. No. 84-1 at 15, 21–22); (Dkt. No. 84-2 at 273–74). When that proved ineffective, Defendant Peralta placed him on six months of disciplinary probation. (Dkt. No. 84-2 at 249); (Dkt. No. 76-1 at 78). Similarly, after the Sullivan incident, Defendants Furr and Moreno charged Kloesel with a disciplinary violation and signed off on his six-month probation, respectively. (Dkt. No. 76-1 at 41); (Dkt. No. 84-1 at 124); (Dkt. No. 84-2 at 174).

Hernandez argues that these disciplinary measures were insufficient and that the Supervisory Officers should have imposed more severe consequences, like termination. (Dkt. No. 84 at 19). But even if the Supervisory Officers' response was one that "most reasonable persons could have improved upon," that is not enough. *I.F.*, 915 F.3d at 369. The Supervisory Officers' conduct must reveal that they were indifferent to the risks that Kloesel posed, yet the record does not support that conclusion.

## IV.     CONCLUSION

For the reasons above, the Court **GRANTS** Defendants Corey Furr, Esmerejildo Moreno, Manuel Peralta, Gene Miller, and John Cirone's Motion for Summary Judgment. (Dkt. No. 76). Plaintiff's claims against these Defendants are therefore **DISMISSED WITH PREJUDICE**.

It is SO ORDERED.

Signed on August 5, 2025.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**